IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JANE DOE, | |
| Plaintiff, | |
| v. | |
| WYNDHAM HOTELS AND RESORTS, INC; PALACE INN FRANCHISING, LLC; SITAPARSO, INC.; VALI LLC, LLC; HD 1960 CORP; AVISH HOSPITALITY, LLC; JAI BHAGAVAN, INC.; | CIVIL ACTION NO. _____ <br><br> JURY TRIAL DEMANDED <br><br> Pursuant to Fed. R. Civ. P. 38 |
| Defendants. | |

## PLAINTIFF'S ORIGINAL COMPLAINT

#5234742v1

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 1

JURISDICTION & VENUE ....................................................................... 3

THE PARTIES ........................................................................................... 4

FACTUAL ALLEGATIONS ....................................................................... 9

   I.     SEX TRAFFICKING............................................................................ 9

   II.    HOUSTON HAS LONG BEEN KNOWN AS A SEX
         TRAFFICKING HUB ...................................................................... 10

   III.   HOTELS ARE A CRITICAL PART OF THE SEX
         TRAFFICKING INDUSTRY .......................................................... 11

       A. The role of hotels........................................................................ 11

       B. The presence of sex trafficking and measures to prevent
          it have been known in the hotel industry for decades. ................ 13

       C. Houston mandates hotel staff receive sex trafficking
          training. ...................................................................................... 15

       D. Defendants chose to ignore obvious signs of sex
          trafficking. .................................................................................. 16

   IV.   THE TRAFFICKING OF PLAINTIFF ............................................... 18

   V.    TRAFFICKING AT THE DAYS INN ............................................... 21

       A. Plaintiff was trafficked at the Days Inn. ..................................... 21

B. Wyndham Defendants controlled the operations of the Days Inn ................................................................... 24

C. Wyndham Defendants knowledge of sex trafficking at its hotels .......................................................................... 25

    i.   The Wyndham Defendants have long known of sex trafficking at their hotels. ..................................................... 25

    ii.  The Wyndham Defendants Knew or Should have known of sex trafficking at the Days Inn including the trafficking of Plaintiff. ........................................................................... 30

VI.    TRAFFICKING AT THE PALACE INN ......................................... 32

A. Plaintiff was trafficked at the Palace Inn. .................................. 32

B. Palace Inn Franchising controlled the operations of the Palace Inn ..................................................................................... 36

C. Palace Inn Franchising knew or should have known of sex trafficking at the Palace Inn including the trafficking of Plaintiff. ........................................................................................ 37

VII.   TRAFFICKING AT THE BUDGET INN .................................... 38

VIII.  TRAFFICKING AT THE CAMELOT INN ................................ 41

IX.    TRAFFICKING AT THE HOTEL ROYALE .............................. 45

COUNT I ........................................................................................... 48

COUNT II .......................................................................................... 51

COUNT III ......................................................................................... 54

COUNT IV ..................................................................................................... 57

COUNT V ...................................................................................................... 59

## INTRODUCTION

1.     In early 2022, Plaintiff Jane Doe was 17 years old.  But instead of attending her high school, she spent her days and nights at a series of hotels in Houston, Texas, being sold for sex by a mother-son duo of traffickers.  One of her traffickers is currently serving a 20-year sentence for trafficking Plaintiff and others. Plaintiff now files this civil action to recover from the hotels that profited from Plaintiff's trafficking, including while she was a minor, from around February 2022 to December 2022.

2.     Houston is one of the largest sex trafficking hubs in the United States. A roughly one-mile stretch of Bisonnet Street—known as the "Blade" and the "Track"—is notorious for prostitution and where sex trafficking victims are forced to work. Another well-known area is the FM 1960 corridor.

3.     Defendants owned and operated hotels located on the Blade or the FM 1960 corridor—including the Budget Inn, Palace Inn, Days Inn, Camelot Inn, and Hotel Royale—where Plaintiff was sold for sex by her traffickers.

4.     Plaintiff's participation was not voluntary. She was deceived, coerced, and forced with violent physical beatings and threats to herself and her loved ones to engage in commercial sex acts—often more than 10 times per day.  And even though Defendants observed Plaintiff, as a minor, at their hotel engaged in commercial sex, and even though they knew or should have known she was

1

being trafficked, they chose instead to profit from her trafficking.

5.     And though she was forced by her trafficker to put on long hair, lashes, shorts and crop tops, her youthful baby-face could not be hidden.

6.     It is no exaggeration to say that sex trafficking is modern day slavery. Traffickers, also known as pimps, coerce sex trafficking victims to engage in commercial sex acts.   They use a combination of deceit, forced drug dependency, and sexual, physical, and psychological abuse to control their victims and to profit from their exploitation.

7.     Traffickers depend on hotels. That is why hotels are the most common setting where sex trafficking occurs. Some hotels, like the Defendants in this case, ignore the well-known signs of sex trafficking to sell more hotel rooms and to make more money. These hotels provide privacy, anonymity, and easy access for sex buyers. And these hotels provide traffickers free reign to operate creating ideal locations for traffickers to victimize young girls like Plaintiff.

8.     Defendants and their employees, including front desk staff, housekeeping, and managers frequently turned a blind eye to the trafficking of Plaintiff and other victims. They knew or should have known about the rampant sex trafficking occurring on their properties.

9.     Sex trafficking is a federal crime under the Trafficking Victims Protection Reauthorization Act ("TVPRA"). To combat the scourge of sex

trafficking, Congress also provided a remedy to trafficking victims against whoever knowingly benefits financially from participation in a venture which that person knew or should have known has engaged in sex trafficking. 18 U.S.C. § 1595(a).

10.    Defendants knew or should have known that each of their ventures—the Budget Inn, Palace Inn, Days Inn, Camelot Inn, and Hotel Royale Ventures— violated the TVPRA. And because Defendants knowingly benefited from participation in these ventures under the TVPRA, they are liable to Plaintiff under the TVPRA.

## JURISDICTION & VENUE

11.    This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under 18 U.S.C. § 1595(a).

12.    Defendants are subject to personal jurisdiction in this district and division.

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

## THE PARTIES

14.    Plaintiff Jane Doe, proceeding pseudonymously, is a natural person who is currently a resident and citizen of Texas.

15.    As a result of the control, force, fraud, and coercion exerted over her Plaintiff was incapable of managing the ordinary affairs of life during the period of her trafficking.

16.    Avish Hospitality, LLC ("Avish Hospitality" and the "Days Inn Defendant") is a for-profit Texas company with its principal place of business in Houston, Texas. It owns and operates the Days Inn and Suites by Wyndham hotel located at 410 FM 1960 Houston, TX 77073 (the "Days Inn"), and owned and operated that hotel while Plaintiff was trafficked there. Avish Hospitality regularly conducts business in the State of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions within Texas resulting in injuries in Texas. It may be served with process through its registered agent: Maya Patel, 410 FM 1960 Houston, TX 77073.

17.    Wyndham Hotels & Resorts, Inc. ("Wyndham") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  Wyndham is one of the largest hotel brands in the world with 20 brands and nearly 9,000 branded properties in more than 80 countries. Wyndham, and its wholly owned subsidiaries including Wyndham Hotels and Resorts, LLC ("WHR") and

4

Wyndham Hotel Group, LLC ("WHG"), regularly conducts business in the State of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions both within Texas and outside of Texas that have resulted in injuries in Texas. Wyndham may be served with process through its registered agent Corporate Creations Network, Inc., 2595 N Dallas Pkwy, Suite 350, Frisco, TX 75034.

18.     Days Inn Worldwide, Inc. ("Days Inn") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. Days Inn is a wholly owned subsidiary of Wyndham by and through Wyndham's subsidiaries WHR and WHG (Wyndham and Days Inn are the "Wyndham Defendants"). Days Inn regularly conducts business in the State of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions both within Texas and outside of Texas that have resulted in injuries in Texas. Days Inn may be served with process through its registered agent Corporate Creations Network, Inc., 2595 N Dallas Pkwy, Suite 350, Frisco, TX 75034.

19.     The Wyndham Defendants are the franchisor of the Days Inn and Suites by Wyndham hotel located at 410 FM 1960 Houston, TX 77073. Its relationship with Avish Hospitality, LLC is governed by both its contract with Avish Hospitality and its course of conduct regarding Avish Hospitality and the operation of the Days Inn.

20.    Wyndham by and through its wholly-owned subsidiary, Days Inn, ultimately exercised control over the day-to-day operations at the Days Inn owned by Avish Hospitality by exerting such a high degree of control that, functionally, Wyndham controlled its operation.

21.    Vali, LLC ("Vali" and the "Palace Inn Defendant") is a for-profit Texas company with its principal place of business in Pearland, Texas. It owns and operates the Palace Inn hotel located at 8200 Southwest Fwy #40 Houston, TX 77036 (the "Palace Inn"), and owned and operated that hotel while Plaintiff was trafficked there. It regularly conducts business in the State of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions within Texas resulting in injuries in Texas. It may be served with process through its registered agent: Raj Das, 1855 N. Main St. Pearland, TX 77581.

22.    Palace Inn Franchising, LLC ("Palace Inn Franchising") is a for-profit Texas company with its principal place of business in Houston, Texas. Palace Inn Franchising franchises 50 Palace Inn locations in Texas alone. It regularly conducts business in the State of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions within Texas resulting in injuries in Texas. It may be served with process through its registered agent: Republic Registered Agent, LLC, 17350 State

6

Hwy 249, Suite 220, Houston, TX 77064.

23.    Palace Inn Franchising is the franchisor of the Palace Inn hotel located at 8200 Southwest Fwy #40 Houston, TX 77036. Its relationship with Vali, is governed by both its contract with Vali and its course of conduct regarding Vali.

24.    Palace Inn Franchising ultimately exercised control over the day-to-day operations at the Palace Inn owned by Vali by exerting such a high degree of control that, functionally, Palace Inn Franchising controlled its operation.

25.    HD 1960 Corp. ("HD 1960" and the "Camelot Inn Defendant") is a for-profit Texas corporation with its principal place of business in Houston, Texas. It owns and operates the Camelot Inn & Suites hotel located at 1425 FM 1960 Road West #34 Houston, TX 77090 (the "Camelot Inn"), and owned and operated that hotel while Plaintiff was trafficked there. HD 1960 regularly conducts business in the State of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions within Texas resulting in injuries in Texas.  It may be served through its registered agent: Hasmukh Vasan, 1425 FM 1960 Road West Houston, TX 77090-3303.

26.    Sitaparso, Inc. ("Sitaparso" and the "Budget Inn Defendant") is a for-profit Texas corporation with its principal place of business in Houston, Texas.

It owns and operates the Budget Garden Suites hotel located at 10525 Bissonnet St. Houston, TX 77099 (the "Budget Inn"), and owned and operated that hotel while Plaintiff was trafficked there. Sitaparso regularly conducts business in the State of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions within Texas resulting in injuries in Texas. It may be served through its registered agent: Nitinkumar P. Patel, 10525 Bissonnet St., Houston, TX 77099.

27.    Jai Bhagavan, Inc. ("Jai Bhagavan" and the "Hotel Royale Defendant") is a for-profit Texas company with its principal place of business in Houston, Texas. It owned and operated the Hotel Royale located at 250 FM 1960 Road East, # 40, Houston, TX 77073 (the "Hotel Royale"), while Plaintiff was trafficked there. Jai Bhagavan regularly conducts business in the State of Texas, derives substantial revenue from services rendered in Texas, and has committed tortious acts or omissions within Texas resulting in injuries in Texas. It may be served with process through its registered agent: Mahesh V. Patel, 3510 Telephone Rd., Houston, TX 77023.

## FACTUAL ALLEGATIONS

### I.    SEX TRAFFICKING

28.    Most individuals involved in prostitution are victims of sex trafficking.[1]

29.    Sex trafficking is the use of force, fraud, or coercion to recruit, harbor, transport, or obtain persons for the purpose of inducing them to engage in a commercial sex act.

30.    Sex trafficking is violent.  Victims are locked up, drugged, beaten, terrorized, and raped repeatedly.  This continual abuse, along with financial, psychological, and emotional manipulation, enables traffickers to control their victims.  Victims are methodically "broken" and controlled by their trafficker through coercive trauma bonding, among other techniques, resulting in an inability of the trafficking victim to act independently of a trafficker, including failing to take advantage of potential opportunities to escape.

### II.    HOUSTON HAS LONG BEEN KNOWN AS A SEX

---

[1] *See*, *e.g.*, A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report, https://endsexualexploitation.org/wp-content/uploads/Overview-of-Demand-Reduction-Efforts-2012.pdf (last visited March 11, 2026); Prostitution and Trafficking in Women: An Intimate Relationship, https://www.tandfonline.com/doi/pdf/10.1300/J189v02n03-09 (last visited March 11, 2026).

## TRAFFICKING HUB

31.     Houston is widely recognized by law enforcement agencies, research organizations, and anti-trafficking advocates as one of the largest sex trafficking hubs in the United States.[2]

32.     And within Houston, certain areas are known hotspots. The most notorious area in Houston for prostitution and sex trafficking is the Bissonnet corridor in southwest Houston, an approximately one-mile segment of Bissonnet Street between the Southwest Freeway and the Sam Houston Tollway, also known as the Blade and the Track.[3]

33.     The FM 1960 corridor in northern Harris County is another area that has been specifically identified by law enforcement as a significant problem area for prostitution and sex trafficking, and numerous police raids and sting operations have been carried out there in response.[4]

---

[2] *See*, *e.g.*, https://www.houstontx.gov/council/committees/pshs/20220120/hpd-human-trafficking.pdf; https://elijahrising.org/human-trafficking-statistics/
[3] https://abc13.com/post/no-more-hourly-rates-for-alleged-hotsheet-hotel/1484300
[4] *See*, *e.g.*, https://www.fox26houston.com/news/13-arrested-prostitution-operation-harris-county-fm-1960;
https://www.khou.com/article/news/crime/mugshots-44-arrested-in-north-houston-prostitution-sting/285-482951782;
https://www.fox26houston.com/news/sex-trafficked-women-rescued-and-several-people-arrested-in-nw-harris-county-prostitution-sting.amp;
https://abc13.com/post/dozens-arrested-in-north-houston-prostitution-

34.    All the hotels at which Plaintiff was trafficked are located in one of these two areas.

### III.    HOTELS ARE A CRITICAL PART OF THE SEX TRAFFICKING INDUSTRY

#### A. The role of hotels.

35.    Without hotels, where illicit sexual encounters are taken off the street and cloaked in the anonymity of a hotel room, the sex trafficking industry would be significantly disrupted.  This obvious fact has been noted by experts and justices of the United States Supreme Court.  In 2015, Justice Antonin Scalia, joined in dissent by Chief Justice John Roberts and Justice Clarence Thomas, noted that,

> Motels . . . are also a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers.

*City of Los Angeles v. Patel*, 575 U.S. 409, 428-29 (2015).

36.    Ninety-two percent of the calls received by the National Human Trafficking Hotline involving hotels and motels reported sex trafficking, and

---

sting/2524843/; https://abc7chicago.com/post/undercover-operation-yields-11-prostitution-arrests/735932/; https://abc7ny.com/archive/8844875/

another two percent reported a combination of sex and labor trafficking.[5]  A 2012 study found that 63 percent of trafficking incidents occurred in hotels.[6] And the Polaris Project found that "75% of [trafficking] survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation . . . .  Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."[7]

37.    ***Attorneys for the hotel industry*** estimated and reported to hotel industry representatives that eight out of ten human trafficking arrests occur in or around hotels.[8]

38.    A number of hotels in Houston, including the Defendants' hotels, accommodate and facilitate the sex trafficking of women, men, and children.

---

[5] *Human Trafficking and the Hotel Industry*, Polaris Project, https://polarisproject.org/wp-content/uploads/2019/09/human-trafficking-hotel-industry-recommendations.pdf (last visited Mar. 11, 2026).

[6] Jon Conte, *et al.*, *Inhospitable to Human Trafficking Program Evaluation*, Businesses Ending Slavery and Trafficking  (July 2014), https://perma.cc/XJ9D-URS4 at 5 (last visited Mar. 11, 2026).

[7] *Hotels and Motels Recommendations*, The Polaris Project, https://polarisproject.org/hotels-motels-recommendations (last visited Mar. 11, 2026).

[8] Rich Keating, *Human Trafficking: What Is It and How It Impacts the Hospitality Industry*, Presentation Delivered at AHIA Sprint Conference 2013, Washington, D.C., http://perma.cc/K2HS-ACER at 6 (last visited Mar. 11, 2026).

Victims, including Plaintiff, were and are rotated through these hotels in a cycle of exploitation, sometimes staying at one hotel for weeks or months.

39.    A significant percentage of the revenue generated in Houston's sex trafficking economy is funneled directly to hotels via the daily or hourly rental of the hotel rooms needed to harbor, exploit, and sell victims, including Plaintiff.

### B. The presence of sex trafficking and measures to prevent it have been known in the hotel industry for decades.

40.    Plaintiff's victimization followed a pattern that was readily observable and should have been obvious to hotel employees based on information available to the public at large and to the hotel industry in particular.

41.    In 2010, the Department of Homeland Security ("DHS") issued guidance to hotel companies identifying warning signs of sex trafficking at hotels.  The Defendants knew or should have known of this guidance.

42.    According to DHS, hotel staff should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without

entry into the room, and the presence of multiple computers or cell phones.[9]

43.    Additional well-known signs of sex trafficking include:

    a.  Individuals that exhibits signs of fear, anxiety, tension, submissiveness, and/or nervousness;

    b.  Individuals that avoid eye contact and interaction with others;

    c.  The presence of a large number of condoms.[10]

44.    The Defendants knew or should have known of the ECPAT-USA and the Code.

45.    The Code was first written in 1998, and it was signed by Carlson Companies in 2004, by Wyndham, Hilton, and Delta in 2011, and by Sabre Holdings in 2012.

46.    As early as 2011, ECPAT-USA partnered with hospitality brands to co-develop training for hotel employees to help them recognize indicators of human trafficking, including the commercial sexual exploitation of children.

---

[9] U.S. Dep't of Homeland Security, *Human Trafficking and the Hospitality Industry*, https://perma.cc/UCC2-FPWY.

[10] *Id.*; *see also* Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited Mar. 11, 2026); Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited Mar. 11, 2026).

47.    ECPAT-USA has also published a number of indicators of trafficking to help hospitality and tourism businesses identify and combat trafficking.  Those indicators include paying for rooms using cash or gift cards, paying for multi-day stays one day at a time, requesting isolated rooms or rooms close to an exit, wearing the same attire or attire that is revealing or inappropriate for the weather, and possessing few personal belongings.

48.    Hotel industry participants were repeatedly warned not to turn a blind eye to sex trafficking.  For example, at a 2013 hotel industry presentation, representatives for the industry were informed, among other things, to "Make sure hotel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[11]

### C. Houston mandates hotel staff receive sex trafficking training.

49.    In recognition of the scope of the sex trafficking problem in Houston and the key role hotels play in facilitating sex trafficking, Houston became the first major U.S. city to pass an anti-trafficking ordinance, and in 2020 passed an ordinance requiring hotel and motel staff to receive human trafficking

---

[11] Keating, *supra* n.8 at 19.

training.[12]

50.    The ordinance requires all hotel operators to:

    a.  train all operators, managers, and employees on recognizing and reporting signs of sex trafficking;

    b.  post a sign in clear view of all employees listing indicators of trafficking and the phone numbers of local law enforcement and the National Human Trafficking Hotline to facilitate reporting; and

    c.  submit annual certifications to the City that all employees have received training in recognizing and reporting the signs of sex trafficking.

51.    Yet despite Houston's efforts, sex trafficking continues to persist in many Houston hotels, including the Defendants' hotels.

### D. Defendants chose to ignore obvious signs of sex trafficking.

52.    Defendants review hotel performance, room occupancy, and profitability like all businesses. Defendants know when revenue is down and seek, in industry parlance, to put more heads in beds. Defendants also know when revenue is up and when that revenue results from turning a blind eye to safety

---

[12] https://www.thomsonreuters.com/content/dam/ewp-m/documents/thomsonreuters/en/thomson-reuters-institute/hotel-ordinance/hotel-ordinance-ara.pdf

and security issues at their hotels, even when Defendants knew or should have known part of those profits were derived from sex trafficking.

53.     The indicia of human trafficking and effective preventative measures are widely known and available to all in the hospitality industry, including Defendants who are required to provide training on the signs of sex trafficking. Defendants knew or should have known of these well-known signs of sex trafficking. Indeed, as PACT ("Protect All Children from Trafficking) has concluded:

> Due to the anonymous, risk-free nature of the hospitality industry, children across the globe are exploited in hotels—ranging from budget properties to luxury resorts. Hotel associates are uniquely situated to identify and report suspicious activity. From check-in to check-out there are a number of indicators victims and traffickers exhibit during the time they are on a hotel property. With proper training, a front desk agent or a housekeeper can notice that something is not right and respond. [13]

54.     Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

55.     Despite knowing what signs to look for and which policies to implement to prevent, identify, and deter sex trafficking in their hotels and to ensure they

---

[13] PACT, *Trafficking in the Hospitality Industry*, https://www.wearepact.org/for-professionals (last visited Mar. 11, 2026).

were not profiting from sex trafficking, Defendants failed to take those steps to protect the revenue trafficking generated.

## IV.    THE TRAFFICKING OF PLAINTIFF

56.    In or around February 2022, when Plaintiff was 17, one of her traffickers used false promises and psychological manipulation to trick her into running away from home and to live with him. What Plaintiff thought would be a supportive relationship quickly took a dark turn.

57.    Her traffickers exerted control over her through physical violence, psychological manipulation, and drug use, and forced her to participate in commercial sex acts for their financial benefit.

58.    Her traffickers set a quota of at least $1,000 per night that she had to make and provide to them.

59.    She was forced by her traffickers to solicit clients, also known as Johns, on the Blade. Plaintiff would engage in commercial sex acts (commonly referred to as "dates") with these men at hotels on or near the Blade, including the Budget Inn and the Palace Inn.

60.    In addition to forcing her to solicit clients on the Blade, Plaintiff's traffickers placed online advertisements featuring her on MegaPersonals,[14] an online website. Clients responding to those ads went to Defendants' hotels to have sex with Plaintiff.

61.    Whether originating on the Blade or the internet, each of Plaintiff's encounters with a John was known as a date or trick.

62.    And while Plaintiff was handed money by the Johns she was required to see, she kept none of it. Her traffickers took it all.

63.    Throughout her trafficking, Plaintiff endured mental, emotional, and physical abuse. She was repeatedly beaten and physically assaulted , including when she attempted to flee her traffickers.

64.    If she failed to meet her quota she was beaten and forced to continue working until she did.

65.    In one instance, Plaintiff was pistol-whipped in the presence of the staff at the Days Inn, leaving her bloody and unconscious.

66.    In addition to abusing Plaintiff, her traffickers threatened to harm her family, including threats to kidnap her little sister and to kill her mom if

---

[14] MegaPersonals (megapersonals.com) is an online classified advertising website that has emerged as one of the primary platforms used by sex traffickers to advertise victims following the federal seizure of Backpage.com in April 2018.

Plaintiff told anyone what was happening to her or that she was being trafficked.

67.    Plaintiff's trafficking continued until in and around December 2022. She was only able to escape after one of her traffickers was arrested.

68.    Throughout the period from in and around February 2022 to December 2022, Plaintiff was trafficked at the Defendants' hotels. She exhibited the well-known signs of a trafficking victim, and those signs were evident to employees at Defendants' hotels.

69.    Plaintiff routinely had obvious physical injuries, including black eyes and visible bruises. Other signs included her deteriorating physical condition that reflected malnourishment, poor hygiene, fatigue, and sleep deprivation. Plaintiff avoided making eye contact with others at Defendants' hotels, lacked control of money and other personal belongings, and was closely monitored by her traffickers.

70.    Unsurprisingly, Plaintiffs' horrific experience as a trafficking victim profoundly affected her physical and mental wellbeing, harm that continues to this day.

## V.    TRAFFICKING AT THE DAYS INN

### A. Plaintiff was trafficked at the Days Inn.

71.    The Days Inn is located along the FM 1960 corridor, a notorious area for prostitution and sex trafficking. Rooms at the Days Inn could be rented for less than a 24-hour period or "by the hour."

72.    The Days Inn Defendant knew or should have known from well before the time of Plaintiff's trafficking, that sex trafficking was occurring both on and around its property.

73.    Plaintiff would go to the Days Inn with Johns who picked her up off the street and Johns who connected with her trafficker, who began posting online ads of her.  By adding internet ads, her trafficker increased the number of "dates" she had. At the Days Inn, it was common for her to have 20 "dates" in a day, each with a different man.

74.    She was trafficked at that hotel along with other minors. Her trafficker housed multiple victims in a single room at the hotel. Another minor trafficking victim, who was with her at the time, had as many as 50 dates a day.

75.    Throughout the day and night, there was a steady stream of Johns coming to the Days Inn for dates with Plaintiff and the other victims trafficked alongside her.

21

76.    While there, Plaintiff's trafficker forced her to meet a daily revenue quota. The ability to set up dates online, increased her quota, and she was forced to engage in even more dates with men per day.

77.    When a John arrived for a date with one of the other minors being trafficked with Plaintiff, she would sit outside the room with her trafficker until the John concluded with the other victim.

78.    The staff observed Plaintiff's trafficker waiting outside the room with a rotating cast of minors, while men came and went to the room throughout the day.

79.    More generally, the staff at the Days Inn observed a larger stream of men coming, staying for a short period of time, and then leaving. They came not only for dates with Plaintiff and her trafficker's other victims, but for dates with the victims of other traffickers also operating from the same hotel.

80.    Once, while at the Days Inn, Plaintiff's trafficker pistol whipped her in the parking lot of the hotel. Plaintiff refused to answer him, and he pistol whipped her, knocking her briefly unconscious. He was yelling at Plaintiff and another trafficking victim was screaming at him to stop. It took Plaintiff over five minutes to stand up.  This all took place in view of the employees in the lobby office at the Days Inn.  Yet, no one came to help her. Instead, the Days Inn continued to take her trafficker's money and rent him a room.

81.    Plaintiff and the other victims being trafficked from the same room frequently requested additional towels and linens from hotel staff as a result of the number of men visiting each day.

82.    And as a result of the volume of men, the trash can in Plaintiff's room, when emptied by hotel staff, was overflowing with used condoms.

83.    During her stays at the Days Inn, Plaintiff observed multiple other sex trafficking victims.

84.    The Days Inn Defendant knew or should have known that Plaintiff, a minor, was a trafficking victim and that it was obtaining revenue from her trafficking.

85.    While at The Days Inn, Plaintiff exhibited physical injuries including visible bruising and black-eyes from regular beatings by her trafficker.

86.    Multiple employees at the Days Inn observed Plaintiff during her stays there. The Days Inn Defendant is responsible for the acts, omissions, and knowledge of its employees while they, within the scope of their employment, rented hotel rooms to her trafficker and cleaned and restocked hotel rooms evidencing a high volume of commercial sex activity.

87.    The Days Inn Defendant facilitated the trafficking of Plaintiff and numerous other victims by, among other things:

      a.  inadequately hiring, training, and supervising its employees;

b. choosing not to report known or suspected criminal activity to law enforcement; and

c. implicitly and/or explicitly encouraging the activity of traffickers, including Plaintiff's traffickers, by creating an environment where trafficking could openly occur without the risk of interference or detection by law enforcement.

## B. Wyndham Defendants controlled the operations of the Days Inn

88.    Upon information and belief, the Wyndham Defendants directly participated in and retained day-to-day control over renting rooms at the Days Inn by, among other things:

a. controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification;

c. requiring the franchisee to use the franchisor's centralized reservation system and franchisor's software for checking guests into rooms and preventing the franchisee from using any other systems;

d. requiring the franchisee to use a property-management system and data-management systems operated and controlled by the franchisor that ensured that data related to each room reservation was received and maintained in the franchisor's systems;

e. assuming sole ownership over all guest information; and

f. overseeing do not rent lists for the property.

### C. Wyndham Defendants knowledge of sex trafficking at its hotels

89. The Wyndham Defendants' actual knowledge of sex trafficking in the hotel industry extended to actual knowledge of open and widespread sex trafficking at its properties from well before Plaintiff's trafficking.

90. While the Wyndham Defendants made public pledges to take steps to prevent sex trafficking at their hotels, those pledges have not stopped their knowing and continuing financial benefit from providing venues for the exploitation of trafficking victims like Plaintiff.

i. The Wyndham Defendants have long known of sex trafficking at their hotels.

91.    Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking.

92.    Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[15] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[16] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[17]

93.    Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[18]

---

[15] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

[16] *Id.*

[17] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2026

[18] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'").

94.    Despite knowing, no later than 2011, that sex trafficking was taking place at its hotels, and publicly committing to take steps to stop it, as recently as 2020, Wyndham made the National Center on Sexual Exploitation's Dirty Dozen List of major contributors to sexual exploitation.[19]

95.    Sex trafficking was prominent at Wyndham-branded properties, including Days Inn. Public information, including scores of news stories and online reviews, confirms both the widespread sex trafficking problem at Wyndham branded hotels and the Wyndham Defendants' knowledge and understanding of the problem.

96.    Over the last two decades, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[20]

97.    Examples of press accounts of sex trafficking at just its Days Inn locations across the country, include, among others:

---

[19] https://endsexualexploitation.org/wyndham/
[20] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

a. In July 2010, a man was arrested at a Days Inn in Metairie, LA on human trafficking charges and was accused of forcing North Carolina teens into prostitution.[21]

b. In June 2011, a woman was sentenced to 9 years in prison for the sex trafficking of two 14-year-old girls. The girls were forced to work at the Days Inn in Hartford, Connecticut.[22]

c. In February 2012, a man was arrested by FBI agents and members of the Human Trafficking Task Force on charges of sex trafficking of children for pimping out a 14-year-old girl who was rescued from a Days Inn in Florida.[23]

d. Three people were arrested in July 2014 in Fayetteville on human trafficking charges after holding a woman captive at a Days Inn.[24]

---

[21] Michelle Hunter, *Man Arrested in Metairie on Human Trafficking Charges; Accused of Forcing North Carolina Teens into Prostitution*, The Times-Picayune (July 20, 2010), https://www.nola.com/news/crime_police/man-arrested-in-metairie-on-human-trafficking-charges-accused-of-forcing-north-carolina-teens-into/article_c113df92- 9046-56a1-bc02-7c065f5a9435.html.
[22] https://www.justice.gov/archives/opa/pr/east-hartford-conn-woman-sentenced-more-nine-years-prison-sex-trafficking-minors (last visited March 11, 2026)
[23] Alexandra Seltzer, *Federal Officials Catch, Arrest Man Alleged to Have Prostituted Jupiter Girl, 14*, The Palm Beach Post (Feb. 7, 2012), https://www.palmbeachpost.com/story/news/crime/2012/02/08/federal-officials-catch-arrest-man/7283405007/.
[24] *Three Arrested on Human Trafficking Charges in NC*, Fox8 (July 2, 2014), https://myfox8.com/news/three-arrested-on-human-traffick

e.  In July 2014, three people were arrested and accused of kidnapping and torturing a woman for human trafficking out of a Days Inn in Orange County, CA.[25]

f.  In September 2014, two Nevada residents were arrested on sex trafficking charges. Officers set up surveillance at a Days Inn in Nashville and "it did not take long for officers to observe heavy foot traffic in and out of that hotel room consistent with a prostitution operation."[26]

g.  In April 2015, a Philadelphia man was sentenced for sex trafficking minors. The man worked as a security guard at a Days Inn in Philadelphia and "provided protection and assistance to sex traffickers operating at the motel in exchange for a daily fee."[27]

---

[25] Jeanne Kuang, *Three Accused of Kidnapping, Torturing Woman for Human Trafficking in Orange County*, NBC Los Angeles (July 30, 2014), https://www.nbclosangeles.com/news/three-accused-of-brutally-kidnapping-torturing-woman-for-human-trafficking-in-orange-county/65718/.

[26] *Las Vegas Man, Woman Jailed on Prostitution Charges*, City of Franklin, TN (Sept. 5, 2014), https://www.franklintn.gov/Home/Components/News/News/2563/.

[27] *Philadelphia Man Sentenced for Sex Trafficking Conspiracy*, U.S. Attorney's Office (April 9, 2015), https://www.fbi.gov/contact-us/field-offices/philadelphia/news/press-releases/philadelphia-man-sentenced-for-sex-trafficking-conspiracy

h. In July 2015, after investigating possible prostitution at a Days Inn in Maryland, Frederick County sheriff's deputies charged a Hagerstown man with human trafficking after two teenage girls were forced into prostitution.[28]

i. In March 2016, a 22-year-old man was arrested in Georgia, and charged with pimping a person under 18 and sex trafficking, after holding a 16-year old against her will at a Days Inn and forcing her to engage in sex in exchange for money.[29]

j. In August 2018, four men were arrested at another Georgia Days Inn for trafficking after a 15-year-old victim was able to call 911.[30]

98.    In addition to public press accounts, the Wyndham Defendants learned of sex trafficking at its hotels through guest reviews that it monitored that repeatedly referenced prostitution and hookers at its hotels.

ii.  The Wyndham Defendants Knew or Should have known of

---

[28] Jeremy Arias, *Hagerstown Man Charged with Trafficking of Two Teenage Girls*, The Frederick News-Post (July 1, 2015), https://www.heraldmailmedia.com/story/news/local/2015/07/01/hagerstown-man-charged-with-trafficking-of-two-teenage-girls/45202521/.
[29] Dyana Bagby, *Sandy Springs Man Arrested in Athens, Ga., for Sex Trafficking*, RoughDraft atlanta (March 24, 2016), https://roughdraftatlanta.com/2016/03/24/sandy-springs-man-arrested-athens-ga-sex-trafficking/.
[30] Wendy Parker, *Delk Road Area Motel Trafficking Arrests: 4 Charged After Girl Calls 911*, East Cobb News (Aug. 21, 2018) https://eastcobbnews.com/tag/days-inn-delk-road-area/

30

>   sex trafficking at the Days Inn including the trafficking of
>   Plaintiff.

99.   Upon information and belief, the Wyndham Defendants knew or should have known of the sex trafficking occurring at the Days Inn due to, among other things, their:

   a.  detailed regular inspections of the property;

   b.  its access to surveillance systems at the property;

   c.  internal investigations regarding the property;

   d.  employment of field agents to work with hotels on trafficking issues;

   e.  receipt of guest complaints;

   f.  monitoring of guest feedback through reviews and survey responses;

   g.  receipt of information from hotel staff; and

   h.  receipt of information from law enforcement.

100.   Upon information and belief, the Wyndham Defendants rules and policies for the Days Inn required its staff and management to report suspected criminal activity, including sex trafficking, to the Wyndham Defendants.

101.   Based upon the extensive trafficking occurring at the Days Inn, the Wyndham Defendants received, or should have received, numerous reports of sex trafficking at the Days Inn.

102. And based upon the reports it received of the Days Inn, and the observation of Days Inn management and employees of Plaintiff, the Wyndham Defendants knew or should have known of Plaintiff's trafficking.

103. The Wyndham Defendants are responsible for the acts, omission, and knowledge of all the employees involved in the operation of the Days Inn because those acts and omissions were committed in the scope and course of employment and because the Wyndham Defendants ratified that conduct.

The Wyndham Defendants further failed to properly hire, train, and supervise its own employees responsible for monitoring and overseeing the operation of the Days Inn, who both knew or should have known of the widespread trafficking and allowed it to continue.

## VI.    TRAFFICKING AT THE PALACE INN

### A. Plaintiff was trafficked at the Palace Inn.

104. The Palace Inn is located just off the Blade, Houston's most notorious area for prostitution and sex trafficking, and was one of the most in-demand hotels for trafficking. It offered proximity to the Blade, did not ask for identification, sold rooms for less than a 24-hour period, or "by the hour." It was so popular it would sometimes, "sell out" and Johns would have to find other nearby hotels.

105.    The Palace Inn Defendant knew from well before the time of Plaintiff's trafficking, that sex trafficking was occurring not only near its property, but at its property.

106.    Trafficking activity was open and obvious at the Palace Inn.  The hotel and parking lot was teeming with prostitutes, trafficking victims, and traffickers outside of rooms and in the parking lots. The offer of commercial sex was obvious with nearly naked women wearing pasties, thongs, heels and little else at the Palace Inn. People openly engaged in sex acts in the parking lot at the Palace Inn.

107.    One online review from around the time of Plaintiff's trafficking states: "if you're looking for a cheap motel and some sexy fun this might be right up your alley . . . it's supposed to be where a lot of the escorts hang out, not that I would know about that (looks nervously around)... so that's probably why they get a lot of hourly-and-then-some business, as well."

108.    Throughout her trafficking, Plaintiff regularly frequented the Palace Inn multiple times a night, sometimes as many as ten to fifteen times, each time with a different man from the Blade.

109.    For each visit she rented a room for a brief period, typically 30 minutes to an hour. The John typically paid for the room in cash or using prepaid cards. And even though she was visible to the staff and observed by the staff at check-

in, they never asked her for any identification. Despite arriving with a different John each time, the hotel staff gave her the same room each time in the center of the hotel. This activity was facilitated by the hotel's staff who observed both Plaintiff and her various dates at each visit.

110.    When at the Palace Inn, Plaintiff was dressed in shorts and a crop top or wearing a short minidress, her hair done long and wearing long lashes. She struggled to walk in heels so she wore sandals, but even the hair and make-up she was required to wear could not disguise her baby-face.

111.    Her trafficker would wait in the car, then, after each date, Plaintiff's trafficker would collect her and return her to the Blade to find another client in a cycle that repeated throughout the day and night. Her trafficker appeared at the Palace Inn multiple times each night she was there and was known to, observed by, and interacted with the hotel's staff.

112.    After each visit, the hotels employees restocked the room with towels and discarded used condoms left in the room. However, they did not change the bedding, which was often covered in bodily fluids from Plaintiff's prior dates that night. Each of these are well-known, "red-flags" for sex trafficking.

113.    During her visits to the Palace Inn, Plaintiff observed multiple other sex trafficking victims, some of whom she knew. Plaintiff observed that the sex trafficking at the hotel appeared to take place in a designated set of rooms.

114.   The Palace Inn Defendant knew or should have known that Plaintiff was a trafficking victim, and it was obtaining revenue from her trafficking.

115.   Multiple employees at the Palace Inn observed Plaintiff during the many nights she frequented the hotel. The Palace Inn Defendant is responsible for the acts, omissions, and knowledge of its employees while they, within the scope of their employment, rented hotel rooms to Johns and traffickers, and cleaned and restocked hotel rooms evidencing commercial sex activity.

116.   While at The Palace Inn, Plaintiff exhibited physical injuries including visible bruising and black-eyes from regular beatings by her trafficker.

117.   The Palace Inn Defendant facilitated the trafficking of Plaintiff and numerous other victims by, among other things:

   a.  inadequately hiring, training, and supervising its employees;

   b.  choosing not to report known or suspected criminal activity to law enforcement; and

   c.  implicitly and/or explicitly encouraging the activity of traffickers, including Plaintiff's traffickers, by creating an environment where trafficking could openly occur without the risk of interference or detection by law enforcement.

### B. Palace Inn Franchising controlled the operations of the Palace Inn

118. Upon information and belief, Palace Inn Franchising directly participated in and retained day-to-day control over renting rooms at the Palace Inn by, among other things:

    a.  controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

    b.  controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification;

    c.  requiring the franchisee to use the franchisor's centralized reservation system and franchisor's software for checking guests into rooms and preventing the franchisee from using any other systems; and

    d.  requiring the franchisee to use a property-management system and data-management systems operated and controlled by the franchisor

that ensured that data related to each room reservation was received and maintained in the franchisor's systems.

### C. Palace Inn Franchising knew or should have known of sex trafficking at the Palace Inn including the trafficking of Plaintiff.

119.   Upon information and belief, Palace Inn Franchising knew or should have known of the sex trafficking occurring at the Palace Inn due to, among other things, their:

  a.  detailed regular inspections of the property;

  b.  its access to surveillance systems at the property;

  c.  internal investigations regarding the property;

  d.  receipt of guest complaints;

  e.  monitoring of guest feedback;

  f.  receipt of information from hotel staff; and

  g.  receipt of information from law enforcement.

120.   Upon information and belief, Palace Inn Franchising's rules and policies for the Palace Inn required its staff and management to report suspected criminal activity, including sex trafficking, to Palace Inn Franchising.

121.   Based upon the extensive trafficking occurring at the Palace Inn, Palace Inn Franchising received, or should have received, numerous reports of sex trafficking at the Palace Inn.

122. And based upon the reports it received of the Palace Inn, and the observation of Palace Inn management and employees of Plaintiff, Palace Inn Franchising knew or should have known of Plaintiff's trafficking.

123. Palace Inn Franchising is responsible for the acts, omissions, and knowledge of all the employees involved in the operation of the Palace Inn because those acts and omissions were committed in the scope and course of employment and because Palace Inn Franchising ratified that conduct.

124. Palace Inn Franchising failed to properly hire, train, and supervise its own employees responsible for monitoring and overseeing the operation of the Palace Inn, who both knew or should have known of the widespread trafficking and allowed it to continue.

## VII.   TRAFFICKING AT THE BUDGET INN

125. The Budget Inn is located on the Blade.

126. The Budget Inn Defendant knew from well before the time of Plaintiff's trafficking, that sex trafficking was occurring both on and near its property. Trafficking activity at the Budget Inn was open and obvious to anyone who set foot on the property, including scantily clad women and girls along with traffickers loitering outside rooms and in the parking lot.

127. One online review from before Plaintiff's trafficking notes that "the parking lot was crawling with prostitutes."

38

128.   Indeed, a few years before Plaintiff's trafficking, Harris County and the City of Houston filed suit against the hotel due to the rampant prostitution there.

129.   Throughout her trafficking, Plaintiff would regularly frequent the Budget Inn multiple times a night, sometimes as many as ten times, each time with a different John from the Blade.

130.   The Budget Inn permitted rooms to be rented for less than a 24-hour period, or "by the hour." For each visit she rented a room for a brief period, typically 30 minutes to an hour. The John typically paid for the room in cash or using prepaid cards. And even though she was visible to the staff and observed by the staff at check-in, they never asked her for any identification. Despite arriving with a different John each time, the hotel staff gave her the same room each time. This activity was facilitated by the hotel's staff who observed both Plaintiff and the John at each visit.

131.   After each date, Plaintiff's trafficker would collect her and return her to the Blade to find another client in a cycle that repeated throughout day and night. Her trafficker appeared at the Budget Inn multiple times each night she was there and was known to, observed by, and interacted with the hotel's staff.

132.   After each visit, the hotels employees restocked the room with towels and discarded used condoms left in the room. However, they did not change the

bedding, which was often covered in bodily fluids from Plaintiff's prior dates that night. Each of these are well-known, "red-flags" for sex trafficking.

133.  During her visits to the Budget Inn, Plaintiff observed multiple other sex trafficking victims, some of whom she knew. Plaintiff observed that the sex trafficking at the hotel appeared to take place in a designated set of rooms on the lower floor of the hotel.

134.  The Budget Inn Defendant knew or should have known that Plaintiff was a trafficking victim and it was obtaining revenue from her trafficking.

135.  Multiple employees at the Budget Inn observed Plaintiff as a minor, during the many nights she came and went from the hotel over and over again, each time with a different man. The Budget Inn Defendant is responsible for the acts, omissions, and knowledge of its employees while they, within the scope of their employment, rented hotel rooms to Johns and traffickers, and cleaned and restocked hotel rooms evidencing commercial sex activity.

136.  While at The Budget Inn, Plaintiff exhibited physical injuries including visible bruising and black-eyes from regular beatings by her trafficker.

137.  The Budget Inn Defendant facilitated the trafficking of Plaintiff and numerous other victims by, among other things:

    a.  inadequately hiring, training, and supervising its employees;

b. choosing not to report known or suspected criminal activity to law enforcement; and

c. implicitly and/or explicitly encouraging the activity of traffickers, including Plaintiff's traffickers, by creating an environment where trafficking could openly occur without the risk of interference or detection by law enforcement.

## VIII. TRAFFICKING AT THE CAMELOT INN

138. The Camelot Inn is also located along the FM 1960 corridor. Plaintiff stayed at The Camelot Inn for two to three months—constantly being trafficked there.

139. The Camelot Inn Defendant knew or should have known from well before the time of Plaintiff's trafficking, that sex trafficking was occurring both on and near its property.

140. The Camelot Inn is one of the hotels where Plaintiff would meet Johns responding to online ads posted of her.

141. During the time she was trafficked at The Camelot Inn, her trafficker used proceeds from the trafficking to pay the hotel room rent. The room was reserved for three days to one week at a time. Plaintiff regularly went down to the hotel lobby to "renew" the rent which she paid in cash. Plaintiff was never asked for identification.

142.    She was trafficked at that hotel along with two other minor trafficking victims. Her trafficker housed multiple victims in a single room at the hotel, with stays lasting as long as two or three months.

143.    By the time Plaintiff arrived at The Camelot Inn, her trafficker had established the ability to solicit tricks online resulting in an enormous number of dates each day—up to 80 per day, some staying as few as 10 minutes. Throughout the day and night, there was a steady stream of Johns coming to the Camelot Inn for dates with Plaintiff and the other victims trafficked alongside her.

144.    While there, Plaintiff's trafficker forced her to meet a daily revenue quota. She was forced to engage in multiple dates with men per day.

145.    When a John arrived for a date with Plaintiff or one of the other minors being trafficked with Plaintiff, the other girls would go sit in the office lobby of the hotel until the John concluded with the other victim.

146.    The staff observed Plaintiff coming and going from the hotel lobby multiple times per day. The hotel staff never offered her assistance and continued to rent to her trafficker. Plaintiff and the other minor victims were also visible and observed by the hotel employees, when their trafficker permitted them to get food at nearby fast-food restaurants.

147.   Plaintiff observed the same employees in the hotel lobby during her stay there - the same woman in the morning and the same man in the evenings. It was always the same two people in the hotel lobby; it never changed while she was at the Camelot Inn. And she observed those employees smiling and laughing with her trafficker.

148.   More generally, the staff at the Camelot Inn observed a larger stream of men coming, staying for a short period of time, and then leaving. They came not only for dates with Plaintiff and her trafficker's other victims, but for dates with the victims of other traffickers also operating from the hotel.

149.   Plaintiff and the other victims being trafficked from the same room frequently requested additional towels and linens from hotel staff as a result of the number of men visiting each day. Housekeeping staff knew the names of Plaintiff and the other trafficking victims. And each day they removed trash that included trash bags full of condoms, sometime bloody items, fully visible through the clear trash can liners.

150.   During her stays at the Camelot Inn, Plaintiff observed multiple other sex trafficking victims. Plaintiff observed that the sex trafficking at the hotel appeared to take place in a designated area of the hotel on the upper floor of the hotel, which had doors that opened to the outside. The first floor appeared to be frequented by drug dealers and drug addicts.

151. Once, while at The Camelot Inn, Plaintiff tried to run away. Her trafficker caught up to her near the entrance to the hotel drive. He grabbed her and dragged her by her hair back to the hotel. This took place in view of employees in the hotel lobby.

152. During her time at The Camelot Inn, a trick held her and another victim at gunpoint, locked her in the bathroom and tried to rob them.

153. While at The Camelot Inn, Plaintiff exhibited physical injuries including visible bruising and black eyes from regular beatings by her trafficker.

154. The Camelot Inn Defendant knew or should have known that Plaintiff was a trafficking victim and that it was obtaining revenue from her trafficking.

155. Multiple employees at the Camelot Inn observed Plaintiff during her stays there. The Camelot Inn Defendant is responsible for the acts, omissions, and knowledge of its employees while they, within the scope of their employment, rented hotel rooms to her trafficker and cleaned and restocked hotel rooms evidencing a high volume of commercial sex activity.

156. The Camelot Inn Defendant facilitated the trafficking of Plaintiff and numerous other victims by, among other things:

    a. inadequately hiring, training, and supervising its employees;

    b. choosing not to report known or suspected criminal activity to law enforcement; and

    c.  implicitly and/or explicitly encouraging the activity of traffickers, including Plaintiff's traffickers, by creating an environment where trafficking could openly occur without the risk of interference or detection by law enforcement.

## IX.  TRAFFICKING AT THE HOTEL ROYALE

157.  The Hotel Royale is also located along the FM 1960 corridor, less than a quarter mile from the Days Inn at which Plaintiff was trafficked.

158.  The Hotel Royale Defendant knew or should have known from well before the time of Plaintiff's trafficking, that sex trafficking was occurring both on and near its property. Trafficking at the Hotel Royale was open and obvious with trafficking victims visible on the property and traffickers loitering outside of rooms and in the parking lot.

159.  The Hotel Royale is one of the hotels where Plaintiff would meet Johns responding to online ads posted of her. The Hotel Royale was also near a popular nightclub and Plaintiff's trafficker told her to get tricks from both the nearby nightclub and at the hotel itself.

160.  She was trafficked at that hotel along with other minors. Her trafficker housed multiple victims in a single room at the hotel.

161.  Throughout the day and night, there was a steady stream of Johns coming to the Hotel Royale for dates with Plaintiff and the other victims trafficked alongside her.

162.  While there, Plaintiff's trafficker forced her to meet a daily revenue quota. She was forced to engage in multiple dates with men per day.

163.  When a John arrived for a date with one of the other minors being trafficked with Plaintiff, she would sit just outside the room, on the open second floor of the Hotel Royale until the John concluded with the other victim.

164.  The staff observed Plaintiff coming and going from the hotel lobby multiple times per day. The hotel staff never offered her assistance and continued to rent to her trafficker.

165.  More generally, the staff at the Hotel Royale observed a larger stream of men coming, staying for a short period of time, and then leaving. They came not only for dates with Plaintiff and her trafficker's other victims, but for dates with the victims of other traffickers also operating from the hotel.

166.  Plaintiff and the other victims being trafficked from the same room frequently requested additional towels and linens from hotel staff as a result of the number of men visiting each day. Housekeeping staff would enter the room and Plaintiff would step outside to wait while they cleaned.

167.   And because of the volume of men, the trash can in Plaintiff's room, when emptied by hotel staff, was overflowing with used condoms.

168.   During her stays at the Hotel Royale, Plaintiff observed multiple other sex trafficking victims. Plaintiff observed that the sex trafficking at the hotel appeared to take place in a designated area of the hotel.

169.   Once, at the Hotel Royale, Plaintiff's trafficker, along with a friend of his, severely beat a John and left him in the room.

170.   The Hotel Royale Defendant knew or should have known that Plaintiff was a trafficking victim and that it was obtaining revenue from her trafficking.

171.   Multiple employees at the Hotel Royale observed Plaintiff during her stays there. The Hotel Royale Defendant is responsible for the acts, omissions, and knowledge of its employees while they, within the scope of their employment, rented hotel rooms to her trafficker, and cleaned and restocked hotel rooms evidencing a high volume of commercial sex activity.

172.   The Hotel Royale Defendant facilitated the trafficking of Plaintiff and numerous other victims by, among other things:

    a.  inadequately hiring, training, and supervising its employees;

    b.  choosing not to report known or suspected criminal activity to law enforcement; and

c. implicitly and/or explicitly encouraging the activity of traffickers, including Plaintiff's traffickers, by creating an environment where trafficking could openly occur without the risk of interference or detection by law enforcement.

## COUNT I
## TVPRA, 18 U.S.C. § 1595
## (Days Inn Defendant and the Wyndham Defendants)

173. Plaintiff repeats and incorporates the allegations set forth in ¶¶ 1-172 above, as if fully set forth herein.

174. In violation of 18 U.S.C. § 1595(a), the Days Inn Defendant, Avish Hospitality, LLC, and the Wyndham Defendants, Wyndham and Days Inn, knowingly benefited from participation in a venture that it knew or should have known engaged in sex trafficking in violation of 18 U.S.C. § 1591.

175. The Days Inn Defendant and the Wyndham Defendants knowingly participated in a venture that operated the Days Inn. This venture, which Plaintiff calls the "Days Inn Venture," included not only these Defendants but also their employees, including employees who were complicit in and supported, assisted, and/or facilitated trafficking at the Days Inn.

176. The Days Inn Venture was in or affecting interstate commerce.

177. The Days Inn Defendant and Wyndham Defendants assumed the risk of operating the Days Inn and the Days Inn Venture. Throughout 2022, the Days

48

Inn Defendant and Wyndham Defendants participated in the Days Inn Venture by, among other things, owning, operating, overseeing, and controlling the Days Inn.

178.    Throughout 2022, the Days Inn Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator.  For example—and at a minimum—the complicit hotel employees who accommodated and facilitated the conduct of traffickers and Johns at the Days Inn could be liable under § 1591 as perpetrators as well as beneficiaries under the TVPRA.

179.    Throughout 2022, the Days Inn Defendant was the employer of the hotel employees at the Days Inn, including hotel employees who facilitated trafficking at the Days Inn.  Therefore, the Days Inn Defendant directly participated in acts of trafficking in violation of § 1591.

180.    At least one of the participants in the Days Inn Venture facilitated the trafficking of Plaintiff at the Days Inn knowing—or acting with reckless disregard for the likelihood—that Plaintiff's traffickers were employing means of force, threats of force, fraud, coercion, or some combination thereof to cause Plaintiff to engage in commercial sex.

181.    Further, at least one of the participants in the Days Inn Venture had a reasonable opportunity to observe Plaintiff, who was a minor, while she was

being trafficked at the Days Inn.

182.   In the course of the Days Inn Venture, hundreds of buyers paid to have sex with Plaintiff at the Days Inn.

183.   The Days Inn Defendant and Wyndham Defendants knew that they were participating in a venture, the Days Inn Venture, and they knew or should have known that the Days Inn Venture violated the TVPRA because the Days Inn Defendant (and its employees, agents, and representatives) saw the signs of sex trafficking exhibited by Plaintiff, her traffickers, the rooms in which Plaintiffs were trafficked, the frequent traffic of numerous male buyers to Plaintiff's room, and the numerous other victims being trafficked at the hotel, and because the Wyndham Defendants had knowledge of the same through the means and control described above.

184.   The Days Inn Defendant and Wyndham Defendants knowingly benefited from the Days Inn Venture by receiving revenue generated by the Days Inn's operation.

185.   Plaintiff suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Days Inn Defendant's and Wyndham Defendants' conduct and their participation in the sex trafficking ventures at the Days Inn.

186.   The Days Inn Defendant and Wyndham Defendants are liable to

Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

187.   All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs.

<strong>COUNT II<br>TVPRA, 18 U.S.C. § 1595<br>(Palace Inn Defendant and Palace Inn Franchising)</strong>

188.   Plaintiff repeats and incorporates the allegations set forth in ¶¶ 1-187 above, as if fully set forth herein.

189.   In violation of 18 U.S.C. § 1595(a), the Palace Inn Defendant, Vali, LLC, and Palace Inn Franchising knowingly benefited from participation in a venture that they knew or should have known engaged in sex trafficking in violation of 18 U.S.C. § 1591.

190.   The Palace Inn Defendant and Palace Inn Franchising knowingly participated in a venture that operated the Palace Inn.  This venture, which Plaintiff calls the "Palace Inn Venture," included not only the Palace Inn Defendant and Palace Inn Franchising but also their employees, including employees who were complicit in and supported, assisted, and/or facilitated trafficking at the Palace Inn.

191.   The Palace Inn Venture was in or affecting interstate commerce.

192.   The Palace Inn Defendant and Palace Inn Franchising assumed the risk

51

of operating the Palace Inn and the Palace Inn Venture. Throughout 2022, the Palace Inn Defendant and Palace Inn Franchising participated in the Palace Inn Venture by, among other things, among other things, owning, operating, overseeing, and controlling the Palace Inn.

193.    Throughout 2022, the Palace Inn Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator. For example—and at a minimum— the complicit hotel employees who accommodated and facilitated the conduct of traffickers and Johns at the Palace Inn could be liable under § 1591 as perpetrators as well as beneficiaries under the TVPRA.

194.    Throughout 2022, the Palace Inn Defendant was the employer of the hotel employees at the Palace Inn, including hotel employees who facilitated trafficking at the Palace Inn.  Therefore, the Palace Inn Defendant directly participated in acts of trafficking in violation of § 1591.

195.    At least one of the participants in the Palace Inn Venture facilitated the trafficking of Plaintiff at the Palace Inn knowing—or acting with reckless disregard for the likelihood—that Plaintiff's traffickers were employing means of force, threats of force, fraud, coercion or some combination thereof to cause Plaintiff to engage in commercial sex.

196.    Further, at least one of the participants in the Palace Inn Venture had a

reasonable opportunity to observe Plaintiff, who was a minor, while she was being trafficked at the Palace Inn.

197.   In the course of the Palace Inn Venture, hundreds of buyers paid to have sex with Plaintiff at the Palace Inn.

198.   The Palace Inn Defendant knew that it was participating in a venture, the Palace Inn Venture, and they knew or should have known that the Palace Inn Venture violated the TVPRA because the Palace Inn Defendant (and its employees, agents, and representatives) saw the signs of sex trafficking exhibited by Plaintiff, her traffickers, the rooms in which Plaintiffs were trafficked, the frequent traffic of numerous male buyers to Plaintiff's room, and the numerous other victims being trafficked at the hotel, and because Palace Inn Franchising had knowledge of the same through the means and control described above.

199.   The Palace Inn Defendant and Palace Inn Franchising knowingly benefited from the Palace Inn Venture by receiving revenue generated by the Palace Inn's operation.

200.   Plaintiff suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Palace Inn Defendant's and Palace Inn Franchising's conduct and its participation in the sex trafficking ventures at the Palace Inn.

201.   The Palace Inn Defendant and Palace Inn Franchising are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

202.   All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs.

**COUNT III**
**TVPRA, 18 U.S.C. § 1595**
**(Budget Inn Defendant)**

203.   Plaintiff repeats and incorporates the allegations set forth in ¶¶ 1-202 above, as if fully set forth herein.

204.   In violation of 18 U.S.C. § 1595(a), the Budget Inn Defendant, Sitaparso, Inc., knowingly benefited from participation in a venture that it knew or should have known engaged in sex trafficking in violation of 18 U.S.C. § 1591.

205.   The Budget Inn Defendant knowingly participated in a venture that operated the Budget Inn.  This venture, which Plaintiff calls the "Budget Inn Venture," included not only the Budget Inn Defendant but also its employees, including employees who were complicit in and supported, assisted, and/or facilitated trafficking at the Budget Inn.

206.   The Budget Inn Venture was in or affecting interstate commerce.

207.   The Budget Inn Defendant assumed the risk of operating the Budget Inn and the Budget Inn Venture.  Throughout 2022, the Budget Inn Defendant

participated in the Budget Inn Venture by, among other things, owning and operating the Budget Inn.

208.  Throughout 2022, the Budget Inn Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator.  For example—and at a minimum—the complicit hotel employees who accommodated and facilitated the conduct of traffickers and Johns at the Budget Inn could be liable under § 1591 as perpetrators as well as beneficiaries under the TVPRA.

209.  Throughout 2022, the Budget Inn Defendant was the employer of the hotel employees at the Budget Inn, including hotel employees who facilitated trafficking at Budget Inn.  Therefore, the Budget Inn Defendant directly participated in acts of trafficking in violation of § 1591.

210.  At least one of the participants in the Budget Inn Venture facilitated the trafficking of Plaintiff at the Budget Inn knowing—or acting with reckless disregard for the likelihood—that Plaintiff's traffickers were employing means of force, threats of force, fraud, coercion or some combination thereof to cause Plaintiff to engage in commercial sex.

211.  Further, at least one of the participants in the Budget Inn Venture had a reasonable opportunity to observe Plaintiff, who was a minor, while she was being trafficked at the Budget Inn.

55

212.    In the course of the Budget Inn Venture, hundreds of buyers paid to have sex with Plaintiff at the Budget Inn.

213.    The Budget Inn Defendant knew that it was participating in a venture, the Budget Inn Venture, and they knew or should have known that the Budget Inn Venture violated the TVPRA because the Budget Inn Defendant (and its employees, agents, and representatives) saw the signs of sex trafficking exhibited by Plaintiff, her traffickers, the rooms in which Plaintiffs were trafficked, the frequent traffic of numerous male buyers to Plaintiff's room, and the numerous other victims being trafficked at the hotel.

214.    The Budget Inn Defendant knowingly benefited from the Budget Inn Venture by receiving a revenue generated by the Budget Inn's operation.

215.    Plaintiff suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Budget Inn Defendant's conduct and its participation in the sex trafficking ventures at the Budget Inn.

216.    The Budget Inn Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

217.    All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs.

56

## COUNT IV
## TVPRA, 18 U.S.C. § 1595
## (Camelot Inn Defendant)

218.  Plaintiff repeats and incorporates the allegations set forth in ¶¶ 1-217 above, as if fully set forth herein.

219.  In violation of 18 U.S.C. § 1595(a), the Camelot Inn Defendant, HD 1960 Corp., knowingly benefited from participation in a venture that it knew or should have known engaged in sex trafficking in violation of 18 U.S.C. § 1591.

220.  The Camelot Inn Defendant knowingly participated in a venture that operated the Camelot Inn.  This venture, which Plaintiff calls the "Camelot Inn Venture," included not only the Camelot Inn Defendant but also its employees, including employees who were complicit in and supported, assisted, and/or facilitated trafficking at the Camelot Inn.

221.  The Camelot Inn Venture was in or affecting interstate commerce.

222.  The Camelot Inn Defendant assumed the risk of operating the Camelot Inn and the Camelot Inn Venture.  Throughout 2022, the Camelot Inn Defendant participated in the Camelot Inn Venture by, among other things, owning and operating the Camelot Inn.

223.  Throughout 2022, the Camelot Inn Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator.  For example—and at a minimum—

the complicit hotel employees who accommodated and facilitated the conduct of traffickers and Johns at the Camelot Inn could be liable under § 1591 as perpetrators as well as beneficiaries under the TVPRA.

224.   Throughout 2022, the Camelot Inn Defendant was the employer of the hotel employees at the Camelot Inn, including hotel employees who facilitated trafficking at the Camelot Inn.  Therefore, the Camelot Inn Defendant directly participated in acts of trafficking in violation of § 1591.

225.   At least one of the participants in the Camelot Inn Venture facilitated the trafficking of Plaintiff at the Camelot Inn knowing—or acting with reckless disregard for the likelihood—that Plaintiff's traffickers were employing means of force, threats of force, fraud, coercion or some combination thereof to cause Plaintiff to engage in commercial sex.

226.   Further, at least one of the participants in the Camelot Inn Venture had a reasonable opportunity to observe Plaintiff, who was a minor, while she was being trafficked at the Camelot Inn.

227.   In the course of the Camelot Inn Venture, hundreds of buyers paid to have sex with Plaintiff at the Camelot Inn.

228.   The Camelot Inn Defendant knew that it was participating in a venture, the Camelot Inn Venture, and it knew or should have known that the Camelot Inn Venture violated the TVPRA because the Camelot Inn Defendant (and its

employees, agents, and representatives) saw the signs of sex trafficking exhibited by Plaintiff, her traffickers, the rooms in which Plaintiffs were trafficked, the frequent traffic of numerous male buyers to Plaintiff's room, and the numerous other victims being trafficked at the hotel.

229.   The Camelot Inn Defendant knowingly benefited from the Camelot Inn Venture by receiving a revenue generated by the Camelot Inn's operation.

230.   Plaintiff suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Camelot Inn Defendant's conduct and its participation in the sex trafficking ventures at the Camelot Inn.

231.   The Camelot Inn Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

232.   All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs.

**COUNT V**
**TVPRA, 18 U.S.C. § 1595**
**(Hotel Royale Defendant)**

233.   Plaintiff repeats and incorporates the allegations set forth in ¶¶ 1-232 above, as if fully set forth herein.

234.   In violation of 18 U.S.C. § 1595(a), the Hotel Royale Defendant, Jai

Baghavan, Inc., knowingly benefited from participation in a venture that it knew or should have known engaged in sex trafficking in violation of 18 U.S.C. § 1591.

235. The Hotel Royale Defendant knowingly participated in a venture that operated the Hotel Royale. This venture, which Plaintiff calls the "Hotel Royale Venture," included not only the Hotel Royale Defendant but also its employees, including employees who were complicit in and supported, assisted, and/or facilitated trafficking at the Hotel Royale.

236. The Hotel Royale Venture was in or affecting interstate commerce.

237. The Hotel Royale Defendant assumed the risk of operating the Hotel Royale and the Hotel Royale Venture. Throughout 2022, the Hotel Royale Defendant participated in the Hotel Royale Venture by, among other things, owning and operating the Hotel Royale.

238. Throughout 2022, the Hotel Royale Venture included at least one participant who would be criminally liable under the TVPRA, 18 U.S.C. § 1591(a), as a sex trafficking perpetrator. For example—and at a minimum— the complicit hotel employees who accommodated and facilitated the conduct of traffickers and Johns at the Hotel Royale could be liable under § 1591 as perpetrators as well as beneficiaries under the TVPRA.

239. Throughout 2022, the Hotel Royale Defendant was the employer of the

hotel employees at the Hotel Royale, including hotel employees who facilitated trafficking at the Hotel Royale. Therefore, the Hotel Royale Defendant directly participated in acts of trafficking in violation of § 1591.

240. At least one of the participants in the Hotel Royale Venture facilitated the trafficking of Plaintiff at the Hotel Royale knowing—or acting with reckless disregard for the likelihood—that Plaintiff's traffickers were employing means of force, threats of force, fraud, coercion or some combination thereof to cause Plaintiff to engage in commercial sex.

241. Further, at least one of the participants in the Hotel Royale Venture had a reasonable opportunity to observe Plaintiff, who was a minor, while she was being trafficked at the Hotel Royale.

242. In the course of the Hotel Royale Venture, hundreds of buyers paid to have sex with Plaintiff at the Camelot Inn.

243. The Hotel Royale Defendant knew that it was participating in a venture, the Hotel Royale Venture, and it knew or should have known that the Hotel Royale Venture violated the TVPRA because the Hotel Royale Defendant (and its employees, agents, and representatives) saw the signs of sex trafficking exhibited by Plaintiff, her traffickers, the rooms in which Plaintiffs were trafficked, the frequent traffic of numerous male buyers to Plaintiff's room, and the numerous other victims being trafficked at the hotel.

61

244.  The Hotel Royale Defendant knowingly benefited from the Hotel Royale Venture by receiving a revenue generated by the Hotel Royale's operation.

245.  Plaintiff suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the Hotel Royale Defendant's conduct and its participation in the sex trafficking ventures at the Hotel Royale.

246.  The Hotel Royale Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees under the TVPRA and punitive damages.

247.  All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiffs.

*    *    *

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendants for the following:

a)    Process issue as provided by law;

b)    Actual damages in amounts to be shown at trial from the Defendants;

c)    All general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

d)    Attorneys' fees;

e)    A trial by jury; and

f)    Such other relief as this Court deems just and appropriate under

the circumstances.

This 11th day of March, 2026.

HARRY DANIELS
GA BAR NO. 234158
SDTX ID NO. 3912606
**LAW OFFICE OF HARRY M.
DANIELS, LLC**
4751 Best Road Suite 205
Atlanta, GA 30337
Tel. (678) 664-8529
Toll Free Fax.1-800-867-5248
daniels@harrymdaniels.com
OF COUNSEL

L. CHRIS STEWART
GA BAR NO. 142289
**STEWART MILLER SIMMONS
TRIAL ATTORNEYS**
3625 Cumberland Blvd Suite C-100
Atlanta, GA 30339
Main: 404-LAW-FIRM
Direct: 404-328-7461
OF COUNSEL

*/s/Manoj S. Varghese*
MANOJ S. VARGHESE
GA BAR NO. 734668
SDTX ID NO. 3957763
TIANA S. MYKKELTVEDT
GA BAR NO. 533512
SDTX ID NO. 3957761
**BONDURANT MIXSON &
ELMORE LLP**
1201 W. Peachtree Street NW
Suite 3900
Atlanta, GA 30309
404-881-4100
404-881-4111-Fax
mykkeltvedt@bmelaw.com
varghese@bmelaw.com
ATTORNEY IN CHARGE